IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION


NO. 5:14-cv-494


| | | |
|---|---|---|
| NEUSE RIVERKEEPER FOUNDATION, INC., and WATERKEEPER ALLIANCE, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | **COMPLAINT** (JURY TRIAL DEMANDED) |
| DUKE ENERGY PROGRESS, INC., | ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |


## NATURE OF THE CASE AND FACTS

1.     This citizen enforcement action challenges ongoing, unlawful discharges of toxic metals and other pollutants by Defendant Duke Energy Progress, Inc. ("DEP" or "Defendant") and other violations of law at its H. F. Lee Steam Electric Plant coal-fired electricity generating plant ("Lee"), in violation of the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251-1376.  On July 1, 2014, Plaintiffs Neuse Riverkeeper Foundation and Waterkeeper Alliance, Inc. (collectively the "Conservation Groups") gave notice of their intent to enforce the CWA against Defendant, incorporated herein as Exhibit A.

2.     Defendant is engaged in the generation, transmission, distribution, and sale of electricity.  Defendant is a corporation with its headquarters in Raleigh, North Carolina.  Lee is owned and operated by Defendant.

1

3.     The Lee plant is located in Goldsboro in Wayne County, North Carolina, adjacent to the Upper Neuse River.

4.     The drinking water intake for the city of Goldsboro's water system is located just a few miles downstream from the Lee coal ash site and its unpermitted discharges.

5.     The Lee site includes one unlined coal ash lagoon on the bank of the Upper Neuse River that was constructed in 1980.  The lagoon is 143 acres in size, contains coal ash stored in a wet state, and is unlined.  The Lee site also includes at least three "inactive" unlined pits constructed in the 1950s and 1960s according to EPA, which are full of old coal ash and also are located on the banks of the Upper Neuse River.

6.     The coal ash lagoon and inactive pits are constructed in the middle of wetlands, and the ground is swampy around these coal ash storage areas.

7.      Moreover, several streams, including Half Mile Branch, run through the inactive coal ash pits at Lee.

8.     The berm of the Lee coal ash lagoon was classified as "High Hazard" by the State of North Carolina and given a rating of "Significant Hazard" by the EPA.  A least one section of the Lee lagoon "does not meet the minimum standard" for slope stability, according to EPA's 2011 dam inspection report.

9.     Due to its proximity to the river, the Lee coal ash lagoon has been damaged repeatedly by flooding.  EPA noted that in 1999, existing sloughing worsened and new sloughs were created on the interior of the dam, and new sloughing and cracks formed in the exterior of the crest of the dam along the Upper Neuse River.  The EPA report also described "significant erosion" at Inactive Ash Pond 2.

2

10. In addition to a permitted outfall discharging from the coal ash lagoon into the Upper Neuse River, Defendant for years has illegally discharged pollutants from its coal ash lagoon into the Upper Neuse River. These discharges of contaminated water are known as seeps, and they are discharging from both the berm at the western (upstream) corner of the coal ash lagoon, and from the eastern (downstream) berm of the lagoon.

11. Seeps also discharge from the eastern berm of the coal ash lagoon into a large wetland area to the east of the coal ash lagoon. This wetland area is adjacent to the Upper Neuse River and is identified as wetlands by both the North Carolina Division of Coastal Management and the U.S. Fish and Wildlife Service. These seeps are collected in one or more unpermitted ditches on the east side of the coal ash lagoon that illegally convey them into the wetlands and the Upper Neuse River.

12. In 2013, DENR considered treating this ditching as an outfall to waters of the United States but decided not to do so.

13. Recent field sampling by DENR of the coal ash wastewater collected in a ditch in this location has revealed elevated concentrations of numerous coal ash pollutants, including arsenic (nearly 10 times the standard), cadmium, mercury, lead, boron, chloride, fluoride, sulfate, aluminum, barium, copper, iron, manganese, nickel, zinc, nitrogen, thallium, and total dissolved solids.

14. Sampling of the seeps at the western corner of the coal ash lagoon has revealed high levels of coal ash pollutants, including arsenic at more than 5 times the applicable standard, cadmium at more than 53 times the standard, chromium at more than 13 times the standard, selenium in excess of the standard, mercury, and barium. These seeps discharge into wetlands

between the coal ash lagoon and the Upper Neuse River, and when the river is high, they discharge directly into the river itself.

15. A 2011 EPA dam inspection report also identified seeps discharging from the downstream berm of the coal ash lagoon. These seeps identified by EPA continue today, despite numerous attempts to repair and prevent them both before and after the EPA inspection.

16. The Lee coal ash lagoon has had problems with seeps for years. The seeps have discharged pollutants without a permit for years, and also have caused ongoing maintenance and erosion problems around the coal ash lagoon.

17. In 2000, the Lee lagoon suffered "significant interior slope slumping and distress" due to seepage. In 2002, contaminated water was observed leaking under the ash lagoon discharge pipe. In 2004, a riser pipe in the Lee lagoon broke off and fell over into the lagoon, causing the water level in the lagoon to drop rapidly. Inspections from 1990 and 2004 reported indications of slope movement on the east berm of the coal ash lagoon.

18. The Lee lagoon discharge pipe consists of a concrete outer pipe with a 12-inch corrugated metal sleeve inside; according to the 2011 EPA dam inspection report, this metal sleeve was inserted in 2002 due to "joint failure" in the concrete pipe outside the coal ash lagoon.

19. Today, the concrete pipe appears to have fully separated at the riverbank, leaving the corrugated metal pipe exposed. A corrugated metal pipe failure was the cause of the February 2014 Dan River spill, in which tens of millions of gallons of coal ash wastewater spilled into the Dan River. In its 2011 dam inspection report for Lee, EPA noted that "[t]he discharge water appeared grey" but no further action appears to have been taken to determine whether coal ash is discharging from the bottom of the Lee coal ash lagoon through cracks or separated joints in the concrete pipe.

4

20.     In addition to these ongoing problems with the Lee coal ash lagoon, EPA has identified an "active stream" flowing from the toe of Inactive Ash Pond 2. Defendant has no permit to pollute this stream, known as Half Mile Branch, nor to pollute or discharge into the other blue line streams flow through and beneath the inactive coal ash pits. This coal ash pollution of the streams constitutes a separate and independent violation of the Clean Water Act. In the alternative, the streams are point sources that pollute the Upper Neuse River, also without a permit.

21.     Defendant is only authorized by the Lee NPDES permit to discharge pollutants from the coal ash areas to the Upper Neuse River via Outfall 001, so all of Defendant's other ongoing point source discharges of coal ash pollutants are unpermitted discharges in violation of its NPDES permit and the CWA.

22.     In addition to these unpermitted discharges, Defendant has violated the terms of its NPDES permit – and thus violated the CWA – by allowing pollutants and coal ash materials including arsenic, boron, cadmium, chromium, and lead to escape from the bottom and sides of its unlined lagoons into the groundwater at Lee and from these seeps, leaks, and streams into North Carolina waters and navigable waters. Defendant's unauthorized discharges of pollutants are prohibited by the Lee NPDES permit and the CWA.

23.     Since at least 2007, elevated levels of pollutants from the coal ash have been documented in groundwater under, at, and around the Lee facility. These substances include toxic and cancer-causing pollutants including arsenic, lead, chromium, cadmium, and beryllium; as well as other coal ash pollutants including boron, iron, manganese, and total dissolved solids. Years of groundwater monitoring well data from the site show the unlined coal ash pits have caused numerous pollutants to exceed their respective standards, including:

5

- Arsenic at over 66 times the standard

- Beryllium at over 2 times the standard

- Boron at over 7 times the standard

- Cadmium at over 231 times the standard

- Chromium at 5 times the standard

- Lead in excess of the standard

- Iron at 112 times the standard

- Manganese at over 61 times the standard

- Total dissolved solids of almost 4 times the standard

24.     In addition, the groundwater at Lee is acidic, with a pH as low as 4.8, well below the state groundwater standard.

25.     Arsenic is a known carcinogen that causes multiple forms of cancer in humans. It is also a toxic pollutant, 40 C.F.R. § 401.15, and a priority pollutant, 40 C.F.R. Part 423 App'x A. Arsenic is also associated with non-cancer health effects of the skin and the nervous system. Barbara Gottlieb, *et al.*, *Coal Ash: The Toxic Threat to Our Health and Environment* (Sept. 2010), at 2. According to the Agency for Toxic Substances and Disease Registry (ATSDR), there is some evidence that in childhood, long-term exposure to arsenic may result in lower IQ scores and exposure to arsenic in the womb and early childhood may increase mortality in young adults. *Id.*

26.     Drinking water containing beryllium in excess of the maximum contaminant level of 4 parts per billion (ppb) can lead to intestinal lesions according to EPA. Beryllium in drinking water may also pose a cancer risk in humans. Because beryllium is an element, it does not degrade over time.

6

27.     Oral exposure to boron has led to developmental and reproductive toxicity in multiple species. Specific effects include testicular degeneration, reduced sperm count, reduced birth weight, and birth defects.

28.     Chronic exposure to cadmium can result in kidney disease and obstructive lung diseases such as emphysema.  Cadmium may also be related to increased blood pressure (hypertension) and is a possible lung carcinogen.  Cadmium affects calcium metabolism and can result in bone mineral loss and associate bone loss, osteoporosis, and bone fractures.

29.     Oral exposure to chromium VI, a toxic and a human carcinogen, has been found to cause cancers of the stomach and mouth.  Exposure to the skin may cause dermatitis, sensitivity, and ulceration of the skin.

30.     Lead is a very potent neurotoxicant that is highly damaging to the nervous system. Health effects associated with exposure to lead include, but are not limited to, neurotoxicity, developmental delays, hypertension, impaired hearing acuity, impaired hemoglobin synthesis, and male reproductive impairment.  Importantly, many of lead's health effects may occur without overt signs of toxicity.  Lead is also classified by the EPA as a "probable human carcinogen."

31.     Iron can render water unusable by imparting a rusty color and a metallic taste and causing sedimentation and staining.

32.     Manganese is known to be toxic to the nervous system.  Manganese concentrations greater than 50 ug/L render water unusable by discoloring the water, giving it a metallic taste, and causing black staining. Exposure to high levels can affect the nervous system; very high levels may impair brain development in children.

7

33.     High concentrations of total dissolved solids can make drinking water unpalatable and can cause scale buildup in pipes, valves, and filters, reducing performance and adding to system maintenance costs.

34.     Concurrent exposure to multiple contaminants may intensify existing effects of individual contaminants, or may give rise to interactions and synergies that create new effects. Where several coal ash contaminants share a common mechanism of toxicity or affect the same body organ or system, exposure to several contaminants concurrently produces a greater chance of increased risk to health.

35.     The Lee facility has the highest concentrations of arsenic of any coal ash facility in the state.  And shockingly, Defendant violated the groundwater standards at Lee at least *279 times* between 2010 and October 2013.  Yet to date, the State has taken no action to require Defendant to stop polluting the groundwater at Lee.

36.     The contaminated groundwater at Lee also flows directly into the Upper Neuse River.   As a result, the coal ash lagoons are also contaminating the Upper Neuse River via this hydrologically connected groundwater, and thus constitute an additional unpermitted point source discharge in violation of the CWA.  These discharges to the river from the coal ash lagoon via the groundwater are also a further violation of the NPDES permit, which prohibits the entry of pollutants to waters of the state, including both groundwater and the Upper Neuse River.

37.     The Lee coal-fired power plant was retired in 2012.  However, the Lee coal ash areas continue to discharge illegally into the river.  As long as the coal ash remains in these leaking, unlined pits, it will continue to discharge into the Upper Neuse River, streams, and wetlands and from the bottom and sides of the lagoon in violation of the CWA.

## JURISDICTION, NOTICE, AND VENUE

38.     Plaintiffs Neuse Riverkeeper Foundation, Inc., and Waterkeeper Alliance, Inc. (collectively the "Conservation Groups") bring this enforcement action under the citizens' suit provision of the Clean Water Act, 33 U.S.C. § 1365.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and has jurisdiction over the parties.

39.     In compliance with 33 U.S.C. § 1365(b)(1)(A), and 40 C.F.R. § 135.2, on July 1, 2014, the Conservation Groups gave Defendant, the Administrator of the United States Environmental Protection Agency ("EPA"), and DENR notice of the violations specified in this complaint and of its intent to file suit after sixty days should those violations continue.  A copy of the notice letter with documentation of its receipt is incorporated herein as Exhibit A.  More than sixty days have passed since the notice was given pursuant to law and regulation, and the violations identified in the notice letter are continuing at this time and are reasonably likely to continue in the future.  Currently, EPA has not commenced and is not diligently prosecuting a civil or criminal action to redress the asserted violations.

40.     DENR has filed an action against Defendant in the Superior Court for Wake County for certain violations of North Carolina law and certain violations of the NPDES permit. *State of North Carolina v. Duke Energy Progress, Inc.,* C.A. No. 13-cvs-11032 (the "DENR action") (Exhibit C).  However, in that action, DENR does not seek to require compliance with the standards and limitations set out in this complaint.  Further, DENR has notified the Conservation Groups that it does not intend to file suit to enforce the standards and limitations set out in this complaint.

41.     In this action, the Conservation Groups enforce those standards and limitations, with which DENR is not seeking to require compliance in the DENR action.  33 U.S.C. § 1365 (b) (1) (B).

42.     In the DENR action, DENR seeks to enforce certain state groundwater statutes and regulations and seeks to enforce the prohibition against unpermitted discharges in the form of unengineered seeps.

43.     However, the standards and limitations set out above are entirely separate and different standards and limitations and permit requirements.

44.     In particular, as to the Removed Substance permit provision, the groundwater statutes and regulations of North Carolina that are alleged in the DENR action govern generally the contamination of groundwater in North Carolina.  The Removed Substances provision of the NPDES permit, on the other hand, is a standard, limitation, condition, and requirement of operating a wastewater treatment facility, such as the Lee lagoons, which Defendant is allowed to operate in accordance with the terms of the NPDES permit.  The NPDES permit's Removed Substances provision logically requires that the operator of a wastewater treatment facility must ensure that the substances it removes during the treatment process (in this instance, settling) do not enter the waters of North Carolina or the navigable waters of the United States.  Otherwise, the wastewater *treatment* facility is not a wastewater treatment facility at all, but instead is a wastewater *transmission* facility and a wastewater *pollution* facility in and of itself, because it would simply move the removed substances from the wastewater into the waters of North Carolina or navigable waters of the United States and would thereby pollute those waters.  That is exactly what Defendant has done and is doing at its Lee wastewater coal ash lagoons.

10

45.     Further, in the DENR action, DENR alleges that Defendant has committed violations of law and its permit through its unpermitted discharges in the form of unengineered seeps.  However, DENR does not allege that the transmission of pollutants from the Lee lagoons and site by way of the hydrologically connected groundwater is an unpermitted discharge in violation of Defendant's NPDES permit.  That is an additional standard and limitation with which the Conservation Groups seek to require compliance in this action.

46.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and 33 U.S.C. § 1365(c)(1).  The challenged discharges from the Lee coal ash lagoons and the violations of the NPDES permit are located and have occurred in this District and Division, and Defendant is a corporation that does business in this District and Division.

### The Conservation Groups and Their Members

47.     The Neuse Riverkeeper Foundation ("NRF") is a § 501(c)(3) non-profit public interest organization operating in eastern North Carolina with offices in Raleigh and New Bern. NRF has members throughout the watershed, including members who live and recreate on the Neuse River downstream from Lee.  NRF's mission is to "protect[], restore[] and preserve[] the Neuse River basin through education, advocacy and enforcement, in order to provide clean water for drinking, recreation and enjoyment to the communities" it serves.

48.     Waterkeeper Alliance is a § 501(c)(3) non-profit public interest organization that connects and supports local Waterkeeper programs to provide a united voice and to champion clean water issues around the world.  The Waterkeeper Alliance seeks to protect fishable, swimmable and drinkable waterways worldwide.  The Neuse Riverkeeper Foundation, Inc., is a member Waterkeeper organization of the Alliance.

11

49. The Conservation Groups and their members have been harmed by Defendant's unpermitted discharges and violations of the NPDES permit and the Clean Water Act. Members of the Conservation Groups live, recreate, and fish on the Neuse River in the vicinity of and downstream from Lee. They fear contamination of drinking water and wildlife by discharges from Defendant's coal ash ponds containing pollutants. Defendant's discharges of contaminants from the unlined Lee ash lagoons and the risk of further discharges through dam failure are reducing the use and enjoyment by the Conservation Groups and their members of the Neuse River. Copies of standing affidavits by members of the Conservation Groups and their officials are attached as Exhibit B.

50. These injuries will not be redressed except by an order from this Court assessing civil penalties against Defendant and requiring Defendant to take immediate and substantial action to stop the flow of contaminated water and groundwater into the Neuse River, to empty the Lee lagoons of all coal combustion byproducts, to move its storage of coal ash away from banks of the Neuse River, to remediate the groundwater contamination at Lee, and to comply with the other relief sought in this action.

## STATUTORY BACKGROUND

51. The objective of the CWA is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To accomplish that objective, Congress set the national goal that "the discharge of pollutants into the navigable waters be eliminated." *Id.* Accordingly, the CWA, 33 U.S.C. § 1311(a), prohibits the discharge of pollutants from a point source to waters of the United States except in compliance with, among other conditions, a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to 33 U.S.C. § 1342.

12

52.     Each violation of an NPDES permit – and each discharge of a pollutant that is not authorized by the permit – is a violation of the Clean Water Act.  33 U.S.C. §§ 1311(a); 1342(a); 1365(f).

53.     The CWA defines a "point source" as "*any* discernable, confined, and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, [or] container . . . from which pollutants are or may be discharged."  33 U.S.C. § 1362(14) (emphasis added).   Under this broad definition, the discharge of pollutants from mining pits, slurry ponds, sediment basins, and mining leachate collection systems have been held to be point sources.  "The term 'point source' has been taken beyond pipes and ditches and now includes less discrete conveyances, such as cesspools and ponds."  *N. Cal. River Watch v. City of Healdsburg*, 2004 U.S. Dist. LEXIS 1008 (N.D. Cal. Jan. 23, 2004) (citing *Cmty. Ass'n for Restoration v. Bosma Dairy*, 305 F.3d 943, 955 (9th Cir. 2002); *Wash. Wilderness Coal. v. Hecla Mining Co.*, 870 F. Supp. 983, 988 (E.D. Wash. 1994)), *aff'd*, 496 F.3d 993 (9th Cir. 2007).  *Accord U.S. v. Earth Sciences, Inc.*, 599 F.2d 368, 374 (10th Cir. 1979) ("[W]hether from a fissure in the dirt berm or overflow of a wall, the escape of liquid from the confined system is from a point source."); *Consolidation Coal Co. v. Costle*, 604 F.2d 239, 249-50 (4th Cir. 1979) (finding that "discharges from coal preparation plant associated areas," which included slurry ponds, drainage ponds, and coal refuse piles, were within CWA definition of point source), *rev'd on other grounds*, 449 U.S. 64 (1980).

54.     In addition, a "point source need not be the original source of the pollutant; it need only convey the pollutant to 'navigable waters.'" *S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95, 105 (2004); *accord W. Va. Highlands Conservancy, Inc. v. Huffman*, 625 F.3d 159, 168 (4th Cir. 2010) (permits are required for discharges from point

13

sources that "merely convey pollutants to navigable waters"). Thus, ditches and channels that convey pollutants but are themselves not the original source constitute point sources. This includes unintentional conveyance of pollutants, for example, through naturally-formed ditches, gullies, or fissures. *See Sierra Club v. Abston Constr. Co.*, 620 F.2d 41, 45 (5th Cir. 1980) (discharge from mining pits and spoil piles through naturally formed ditches caused by gravity flow at a coal mining site are point sources); *Earth Sciences*, 599 F.2d 368 (holding unintentional discharges of pollutants from a mine system designed to catch runoff from gold leaching site during periods of excess melting met the statutory definition of a point source); *N.C. Shellfish Growers Ass'n v. Holly Ridge Assocs., LLC*, 278 F. Supp. 2d 654, 679 (E.D.N.C. 2003) ("Notwithstanding that it may result from such natural phenomena as rainfall and gravity, the surface run-off of contaminated waters, once channeled or collected, constitutes discharge by a point source."); *O'Leary v. Moyer's Landfill, Inc.*, 523 F. Supp. 642, 655 (E.D. Pa. 1981) (intent of the discharging entity is irrelevant).

## CLAIMS FOR RELIEF

55.     The allegations of the preceding paragraphs are incorporated by reference as if repeated and set forth herein.

### I.     Violation of Removed Substances Permit Provision

56.     Defendant has violated the CWA by violating an express condition in the Lee NPDES permit barring the pollutants from the coal ash lagoons from entering North Carolina waters and navigable waters.

57.     Defendant's NPDES permit, Part II.B.1, states that "[t]he Permittee must comply with all conditions of this permit. *Any permit noncompliance constitutes a violation of the CWA . . . and is grounds for enforcement action . . .*" Permit No. NC0003417 (emphasis added). 33

14

U.S.C. §§ 1365 (f)(6),1342(a); 40 CFR § 122.41(a)) ("Any permit noncompliance constitutes a violation of the Clean Water Act and is grounds for enforcement action."); *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 152 (4th Cir. 2000) (confirming citizens are "authorized to bring suit against any NPDES permit holder who has allegedly violated its permit.").

58.     Defendant has violated the provision of its NPDES permit titled "Removed Substances," which prohibits the entrance of pollutants from the coal ash lagoons into North Carolina waters or navigable waters.  Part II.C.6 of the permit requires that

> Solids, sludges, filter backwash, or other pollutants removed in the course of treatment or control of wastewaters shall be utilized/disposed of . . . in a manner such as to *prevent any pollutant from such materials from entering waters of the State or navigable waters of the United States* except as permitted by the Commission.

(emphasis added).

59.     The Lee coal ash lagoon has received and treated various waste streams, including coal ash and ash transport water.  These waste streams are treated by sedimentation in the coal ash lagoon.  Pollutants that have been removed in the course of treatment are stored in the lagoon.

60.     The "Removed Substances" provision of the Lee NPDES permit prohibits the permittee from allowing coal ash contaminants removed in the course of treatment (*i.e.*, settling) as well as other waste streams that discharge to the ash lagoons at Lee to enter the waters of North Carolina.  Groundwater and the wetlands at the Lee site are included in the North Carolina pollution control statute's definition of waters of the State.  N.C. Gen. Stat. § 143-212(6).  So is the Neuse River.

15

61.     This provision is a logical requirement of operating a permitted wastewater treatment facility.  A wastewater treatment facility exists in order to remove substances from water before the water is discharged into the state's and the nation's waters.   It does not serve its basic function as a wastewater treatment facility if it removes substances in the course of treatment and then discharges them otherwise into the waters of the state or the nation.  The facility certainly fails its basic function of wastewater treatment if it leaks or seeps and thereby discharges removed substances into groundwater or navigable waters.

62.     Pollutants, solids, and sludges from Defendant's Lee coal ash lagoon and inactive ash areas have for years been entering State waters and navigable waters.  These unlined coal ash areas have leached, and will continue to leach, these substances and pollutants from their bottoms and sides into the groundwater at the Lee site.  These pollutants also flow into state waters and navigable waters through the flows of water from seeps, leaks, and streams flowing through and out of the coal ash areas and lagoon.

63.     Defendant has allowed pollutants removed during wastewater treatment to enter waters of the State and navigable waters, including arsenic, lead, chromium, cadmium, beryllium, iron, manganese, and total dissolved solids, as well as other coal ash pollutants.

64.     The Lee coal ash settling lagoon is a wastewater treatment system; its purpose is to treat and remove solids, sludges, substances, materials, and pollutants.  Instead, in violation of an express provision of its permit, Defendant has been and is allowing the unpermitted and uncontrolled entrance of solids, sludges, substances, materials, and pollutants, including toxic metals, into the waters of the State and navigable waters of the United States. All the coal ash in the inactive ash pits was also removed by settling and has been deposited in the unlined pits,

which are continuing to leach pollutants into the groundwater and adjacent river, also in violation of this permit provision.

65. By allowing pollutants to be discharged through the seeps of contaminated surface water discharging to the Upper Neuse River and adjacent wetlands, Defendant is also violating the Removed Substances permit provision.

66. Defendant's actions are a straightforward violation of this straightforward provision of the permit. Accordingly, Defendant's unauthorized discharges of solids, sludges, and pollutants to State waters and navigable waters constitute violations of its NPDES permit and thus of the CWA.

67. This prohibition of discharges of pollutants from the Lee coal ash facilities is enforceable through a citizen suit under the CWA. *See* 33 U.S.C. § 1370 (allowing states to adopt and enforce more stringent limitations in CWA permits than the federal government); 33 U.S.C. § 1311(b)(1)(B) (stating that more stringent state limitations in furtherance of the objective of the CWA include "those necessary to meet water quality standards"); *Nw. Envtl. Advocates v. City of Portland*, 56 F.3d 979, 986 (9th Cir. 1995) ("The plain language of CWA § 505 authorizes citizens to enforce all permit conditions"); *Culbertson v. Coats Am.*, 913 F. Supp. 1572, 1581 (N.D. Ga. 1995) (holding that "[t]he CWA authorizes citizen suits for the enforcement of all conditions of NPDES permits").

68. Because these permit violations and discharges from the unlined lagoon and inactive coal ash pits to the waters of the State are continuous and ongoing, they will continue after the date of this letter and the subsequent filing of a lawsuit.

## II. Unauthorized Discharges of Point Source Pollution to Waters of the United States

69. The Lee coal ash lagoon is discharging in violation of the Clean Water Act because one or more of the dikes or berms for the lagoon are discharging through unpermitted flows, seeps, leaks, ditches, and channels into the Upper Neuse River, Half Mile Branch and other streams running through the inactive coal ash pits, and the adjacent wetlands. These seeps are all point sources under the CWA that convey unpermitted discharges into waters of the United States.

70. The ash lagoon at the Lee facility has received coal ash that is sluiced to the unlined coal ash lagoon in a wet form along with other waste streams. And coal ash has also been deposited in the unlined inactive coal ash pits. These substances contain metals and other pollutants that tend to leach or dissolve into water that comes into contact with the coal ash.

71. As described above, the lagoon and inactive coal ash pits; their berms; their leaks, flows, and seeps; the streams running through them; and the consequent channels and engineered ditches, are all unpermitted point sources under the CWA.

72. The State of North Carolina, in a verified complaint against Defendant (attached as Exhibit C), confirms that unspecified "non-engineered seeps" at Lee are point source discharges not authorized by the Lee NPDES permit. Exhibit C at ¶¶ 137-38. The State's complaint does not allege the engineered ditch point source discharges to wetlands and the river. Nor does the State's complaint allege coal ash pollution of the Half Mile Branch stream and the other streams running through and along the inactive coal ash pits.

73. Because these surface discharges to the Upper Neuse River and adjacent wetlands are continuous and ongoing, they will continue after the date of this letter and the subsequent filing of a lawsuit.

**III.    Discharges through Close Hydrologic Flow into Waters of the United States**

74.    The contaminated groundwater under and around the coal ash lagoons at the Lee site is also discharging into the Upper Neuse River, tributaries, streams, and wetlands, which are directly adjacent to the lagoon and inactive coal ash pits.  These hydrologically connected discharges to waters of the United States constitute an additional violation of the "Removed Substances" provision of the Lee NPDES permit.

75.    In addition, these discharges via hydrologically-connected groundwater to navigable surface waters of the United States, tributaries, streams, and wetlands are unpermitted point source discharges of pollutants and thus constitute a third, independent violation of the CWA.

76.    The CWA prohibits "any addition of any pollutant to navigable waters from any point source."  33 U.S.C. § 1362(12)(A).  "[T]he touchstone for finding a point source is the ability to identify a discrete facility from which pollutants have escaped."  *Wash. Wilderness Coal. v. Hecla Mining Co.*, 870 F. Supp. 983, 987 (E.D. Wash. 1994).

77.    Because there is a direct hydrologic connection between the coal ash lagoons and the Upper Neuse River, tributaries, streams, and wetlands, Defendant's unpermitted discharges of pollutants from the lagoon and inactive coal ash pits via the groundwater to these waters and wetlands, as well as the lagoon and coal ash pits themselves, are point sources that violate the CWA.  As with the groundwater contamination described in Part I, these pollutants include arsenic, lead, chromium, cadmium, and beryllium, boron, iron, manganese, total dissolved solids, and other coal ash pollutants.

78.    Unpermitted discharges of pollutants via hydrologically connected groundwater to surface waters of the United States violate the CWA.  EPA has explained repeatedly that the

CWA applies to such discharges. 66 Fed. Reg. 2960, 3015 (Jan. 12, 2001) ("EPA is restating that the Agency interprets the Clean Water Act to apply to discharges of pollutants from a point source via ground water that has a direct hydrologic connection to surface water."); 56 Fed. Reg. 64876-01, 64892 (Dec. 12, 1991) ("the Act requires NPDES permits for discharges to groundwater where there is a direct hydrological connection between groundwaters and surface waters."); 55 Fed. Reg. 47990, 47997 (Nov. 16, 1990) (announcing stormwater runoff rules and explaining that discharges to groundwater are covered by the rule where there is a hydrologic connection between the groundwater and a nearby surface water body).

79. Because these hydrologically connected discharges from the unlined lagoon and inactive coal ash pits to navigable waters of the United States, tributaries, streams, and wetlands are continuous and ongoing, they will continue after the date of this letter and the subsequent filing of a lawsuit.

80. All the violations of the CWA alleged above in all the claims for relief are continuing violations.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Issue a declaratory judgment stating that Defendant is violating the CWA due to its ongoing unpermitted discharges of toxins, heavy metals, coal ash, pollutants, and other contaminants, and by allowing and causing the entering of such removed substances into the Neuse River, tributaries, streams, wetlands, and groundwater in violation of Defendant's NPDES permit and the CWA;

B. Enter appropriate preliminary and injunctive relief to ensure that Defendant:

i. Ceases all unpermitted discharges from engineered seeps and other unpermitted engineered discharges into the Neuse River, tributaries, streams, and wetlands;

ii. Prevents the flow of contaminated groundwater into the Neuse River, tributaries, streams, and wetlands;

iii. Prevents the coal ash impoundments from allowing or causing the entering of removed substances, including solids, sludges, materials, substances, and pollutants, into groundwater, the Neuse River, tributaries, streams, and wetlands;

iv. Removes all existing coal combustion byproducts from the coal ash lagoon at Lee within a reasonable amount of time and stores them in an appropriately lined industrial solid waste landfill facility away from the Neuse River, tributaries, streams, and wetlands, with appropriate monitoring and collection and treatment of wastewater or leachate coming from the landfill;

v. Remediates the groundwater beneath and around the Lee site resulting from its unpermitted discharges; and

vi. Removes from the Neuse River, tributaries, streams, and wetlands pollutants it has illegally allowed to enter those waters and wetlands and that it has illegally discharged into them.

C. Assess civil penalties against Defendant of up to $37,500 per violation per day pursuant to 33 U.S.C. §§ 1319(d), 1365(a), and 74 Fed. Reg. 626, 627 (Jan. 7, 2009);

D. Award Plaintiffs the costs of this action, including reasonable attorney and expert fees, as authorized by 33 U.S.C. § 1365(d); and

21

E.    Grant Plaintiffs such further and additional relief as the Court deems just and proper.

THE PLAINTIFFS HEREBY DEMAND A TRIAL BY JURY

This the 3rd day of  September, 2014.

/s/ Frank S. Holleman III
Frank S. Holleman III
  N.C. Bar No. 43361
  fholleman@selcnc.org
Nicholas S. Torrey
  N.C. Bar No. 43382
  ntorrey@selcnc.org
Southern Environmental Law Center
601 West Rosemary Street, Suite 220
Chapel Hill, NC 27516-2356
Telephone:  (919) 967-1450
Facsimile:  (919) 929-9421

*Attorneys for Plaintiffs*